UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JOSEPHINE FERGUSON | * | |
| Plaintiff | * | |
| v. | * | Civil Case No. 8:21-cv-1990-AAQ |
| CREATIVE HAIRDRESSERS, INC. D/B/A HAIR CUTTERY | * | |
| Defendant | * | |

**MEMORANDUM OPINION**

This is a case concerning allegations that a routine hair appointment damaged a customer's hair. Pending before the Court is Defendant Creative Hairdressers, Inc. d/b/a Hair Cuttery's Motion for Summary Judgment. ECF No. 32. The Motion has been fully briefed and I conclude that a hearing is not necessary under this Court's Local Rules. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons discussed below, Defendant's Motion shall be denied.

**BACKGROUND**

Plaintiff Josephine Ferguson has been receiving routine chemical treatments on her hair for over forty-five years. ECF No. 33-2, at 1. As part of such, she receives a "touchup" or "perm",[1] the effect of which is to straighten her hair, and then has her hair colored. *Id.* at 1-2. She receives such treatments on average every six to eight weeks, though sometimes less frequently. *Id.* at 2. For more than thirty years, either her sister-in-law or another family member relaxed and/or colored Ms. Ferguson's hair. *Id.* In between receiving these services, she would shampoo, blow

---

[1] Ms. Ferguson explained that she uses the term "perm" to describe hair straightening or hair relaxing. ECF No. 33-2, at 1.

1

dry, and then flat iron her hair every two to three weeks. *Id.* at 4. She also would apply oil to her own scalp. *Id.* at 8. Beginning in or around 2010, Ms. Ferguson began to visit a salon for these services. *Id.* at 3. For several years, she received services at Salon Cielo or another salon closer to her home. *Id.* Sometime in 2018, Ms. Ferguson began receiving services from Melanie Stuckey at the Hair Cuttery, the Defendant in this case. *Id.* at 3.

Until approximately June 5, 2018, Ms. Ferguson was generally satisfied with the condition of her hair. By her own account, she had "long, beautiful hair, past [her] shoulders." *Id.* at 4. Although she naturally shed small amounts of hair, as all individuals do, *id.* at 7, she alleges she did not have any bald spots or alopecia, nor had she received any medical treatment related to her hair or scalp condition. *Id.* at 8. Sometime before May 29, 2018, Ms. Stuckey left employment with the Hair Cuttery. *Id.* at 7. Ms. Ferguson, nonetheless, decided to continue receiving hair services there. What happened next is a significant source of dispute between the parties.

I. **The Events According to Ms. Ferguson.**

On or about May 29, 2018, Ms. Ferguson's hair was treated by Michelle Pinkney, another employee of the Hair Cuttery. *Id.* Ms. Ferguson scheduled another appointment to see Ms. Pinkney on June 5, 2018. On that date, Ms. Ferguson asked for her standard treatment – a touch up and color to account for the amount of new gray hair that had grown in since her last relaxation and coloring treatment. *Id.* at 9. The two did not discuss the process; rather, Ms. Pinkney took Ms. Ferguson to the back of the shop, draped a cloth over her and "started the process." *Id.* at 9. Ms. Pinkney turned Ms. Ferguson away from the mirror so she could not see what Ms. Pinkney did, but Ms. Ferguson felt a brush applying a substance to her hair. *Id.* at 10. After some time, Ms. Pinkney washed the substance out of Ms. Ferguson's hair; she then dried Ms. Ferguson's hair with a blow dryer and straightened it using a flat iron. *Id.* at 10.

However, that evening, after Ms. Ferguson returned home, while she was combing her hair, she noticed "a lot" of her hair falling into the sink. *Id.* at 11. For a number of days afterwards, Ms. Ferguson noticed that pieces of her hair continued to break, each one at least one or two inches long. *Id.* at 11-12. At some point over the course of the next month, Ms. Ferguson returned to the Hair Cuttery, where she spoke with Ms. Pinkney regarding the condition of her hair. *Id.* at 14. According to Ms. Ferguson, when she expressed concern regarding the condition of her hair to Ms. Pinkney, Ms. Pinkney responded that the best course would be for Ms. Ferguson to cut her hair off. *Id.* On July 14, 2018, Ms. Ferguson visited Ms. Stuckey, who was able to take some action to stop the hair breakage. *Id.* at 12.

## II.   The Events According to Ms. Pinkney.

Perhaps unsurprisingly, Ms. Pinkney has a different recollection of her interactions with Ms. Ferguson. Sometime on or around the last week of May, Ms. Pinkney recalls treating Ms. Ferguson's hair for the first time. Ms. Ferguson contracted with the Hair Cuttery for the application of a protein conditioner called "Redken Chemistry", and then a "press and curl."[2] ECF No. 33-3, at 1. According to Ms. Pinkney, Ms. Ferguson specifically asked for the protein treatment because she had been suffering from hair breakage prior to receiving any services from Ms. Pinkney. *Id.* at 2. In fact, according to Ms. Pinkney, Ms. Stuckey had been treating Ms. Ferguson's hair regularly for this problem, *id.*, including on at least one occasion, over Ms. Ferguson's objections. ECF No. 34-1, at 9. However, Ms. Pinkney indicated that although she had seen split ends and dryness, *id.* at 23, she never saw any evidence of breakage or scalp irritation when treating Ms. Ferguson's hair. *Id.* at 21. Ms. Pinkney does not recall relaxing Ms. Ferguson's hair during their first meeting. *Id.* at 6.

---

[2] Ms. Pinkney explained that "press" was another word for "blow dry." ECF No. 34-1, at 8.

On June 5, 2018, Ms. Pinkney again treated Ms. Ferguson's hair. ECF No. 33-3, at 4. Consistent with Ms. Ferguson's recounting, Ms. Ferguson contracted with Ms. Pinkney to have her hair relaxed, conditioned, colored, and iron set. *Id.* The press Ms. Ferguson received on her first visit was made unnecessary by the relaxation treatment. *Id.* at 5. Ms. Ferguson had come in for the treatment specifically because she planned to attend an upcoming class reunion. *Id.*

Ms. Pinkney described the treatment, as follows. First, Ms. Pinkney applied the "base" from Ms. Ferguson's scalp to about an inch above the scalp to account for the new hair that had grown in. *Id.* After the base, Ms. Ferguson applied the relaxer. *Id.* Ms. Pinkney typically leaves the relaxer on for approximately fifteen to twenty minutes, but because Ms. Pinkney perceived Ms. Ferguson's hair as short and medium textured, she left the relaxer on for ten to twelve minutes. *Id.* After the relaxation was complete, Ms. Pinkney colored Ms. Ferguson's new hair growth and iron set her hair. *Id.* at 6. As Ms. Ferguson described, Ms. Pinkney does not recall Ms. Ferguson complaining about any burning sensation during the procedure, other than exclaiming "ooh" due to a tingling sensation she experienced when Ms. Pinkney sprayed Ms. Ferguson's hair with an alcohol-based spray. *Id.*

After the events of June 5, Ms. Ferguson saw Ms. Pinkney for hair services approximately three more times. *Id.* at 3, 4. Ms. Pinkney did not apply relaxer to Ms. Ferguson's hair during any of these visits. ECF No. 34-1, at 10. During the next two visits, according to Ms. Pinkney, Ms. Ferguson did not raise any concerns regarding damage to her hair. ECF No. 33-3, at 3. However, Ms. Pinkney admits that during their fifth and final visit, Ms. Ferguson asked Ms. Pinkney if she had seen any of her hair in the sink when treating her hair. *Id.* When Ms. Pinkney responded in the negative, Ms. Ferguson stated that, as she brushed her hair at home, she "had seen a few strands of . . . hair" come out. *Id.* Although Ms. Ferguson allegedly conceded the amount of hair was not

4

"a lot," she stated it was "concerning." *Id.* Ms. Pinkney denied ever telling Ms. Ferguson that she should deal with the problem by simply cutting her hair off. ECF No. 34-1, at 21. Sometime thereafter, Ms. Pinkney recalled discussing Ms. Ferguson's hair with another Hair Cuttery employee who recounted that Ms. Ferguson had contacted the Hair Cuttery to complain about damage to her hair. *Id.* at 10.

### III.     The Litigation.

Ms. Ferguson initially filed her Complaint in Circuit Court in Prince George's County, Maryland. ECF No. 1-5. Her Complaint alleged a single count of negligence arising out of the events described above. Ms. Ferguson specifically alleged injuries to her scalp, head and hair; medical expenses; physical and emotional pain and suffering; and loss of past, present and future income. ECF No. 1-5, at 4. As relief, Ms. Ferguson demanded a judgment "in excess of . . . $75,000." *Id.* at 5.

On August 6, 2021, Defendant removed the case to this Court. ECF No. 1. On October 22, 2021, this case was referred to the Honorable Charles Day for all further proceedings. ECF No. 12. As noted above, during discovery, the parties deposed Ms. Pinkney and Ms. Ferguson. Plaintiff additionally sought to depose Ms. Stuckey, as well as two of Defendant's other employees. ECF No. 33-1, at 9. According to Plaintiff, these three individuals refused to appear for deposition. *Id.* Plaintiff, however, did not seek relief from the Court as to their non-appearance other than an extension of the relevant discovery deadline.

During Ms. Pinkney's deposition, she reviewed photos of Ms. Ferguson's hair. ECF No. 33-3 at 7. Ms. Pinkney admitted that Ms. Ferguson's hair was damaged in multiple places, and in her opinion, that damage appeared to be the result of chemical treatments. ECF No. 33-3 at 7. In Ms. Pinkney's opinion, the specific type of damage – breaking, thinning and sparseness of hair

and split ends – appeared to be the result of either bleaching or relaxation chemicals. *Id.* at 7-9. Ms. Pinkney indicated that that type of damage could have been the result of the application of a relaxer and a peroxide-based coloring at the same time, ECF No. 34-1, at 20-21, though Ms. Pinkney denied doing so to Ms. Ferguson's hair. *Id.* at 21.

Defendant also issued interrogatories to Plaintiff. In her answers, Plaintiff confirmed, as she did in her deposition, that she was unaware of the specific chemicals that Ms. Pinkney applied to her hair, ECF No. 32-2, at 5; by the time she arrived home after her scheduled service on June 5, she was losing her hair, and that portions of her scalp had been burned, *id.*; she possessed photos of the damage to her hair and scalp, *id.* at 6; she was not, in fact, making a lost wage claim, *id.* at 11; and that the total medical bills and economic losses related to the incident totaled less than $2,000, *id.* at 10.

Plaintiff reserved the right to call as an expert Dr. Don Fontana, a plastic surgeon based in Waldorf, Maryland. ECF No. 32-3, at 1. Plaintiff stated that Dr. Fontana would testify about, among other things: 1) Plaintiff's care and treatment arising out of the June 5th incident, *id.*; 2) the medical necessity and reasonableness of Plaintiff's medical expenses, *id.*; 3) the nature and extent of Plaintiff's physical impairments arising out of the incident, *id.*; and 4) the cost and extent of Plaintiff's medical treatments going forward, *id.* at 2. Finally, Plaintiff reserved the right to call each health care provider who treated Plaintiff, based on their records of treatment as provided in discovery. *Id.*

Dr. Fontana's report, however, proved to be more ambiguous than the claims in Plaintiff's Complaint. Although it did not discredit Ms. Ferguson's account, it did not conclusively confirm all of it either. Dr. Fontana began by recounting that Ms. Ferguson had not received any treatment for hair loss or breakage prior to the incident. ECF No. 32-4, at 1. Approximately one month after

the incident, Plaintiff visited a dermatologist, Dr. Mathew Morrissey, who diagnosed her with hair loss and prescribed her steroids for treatment.  *Id.*  Dr. Fontana's review of Ms. Ferguson's scalp confirmed that she had "slightly decreased hair density" at the apex of her head.  *Id.*  However, Dr. Fontana was not able to conclusively determine that Ms. Ferguson's hair loss was the result of the incident.  Rather, he concluded that it could be "causally related to the alleged chemical injury . . . or [wa]s related to central centrifugal cicatrical alopecia which is common in [B]lack women[.]"  *Id.*  As to Ms. Ferguson's condition and treatment going forward, Dr. Fontana concluded that Ms. Ferguson had reached "maximum medical improvement," that no additional "plastic surgical treatment was necessary," and that Ms. Ferguson "has not sustained any permanent or temporary disability."  *Id.*  Dr. Fontana concluded that Dr. Morrissey's "evaluation, treatment and diagnosis were completely appropriate."  *Id.* at 2.  Plaintiff's medical records generally accord with Dr. Fontana's conclusions.  ECF No. 32-6.

Plaintiff, in turn, issued Requests for Production to Defendant.  ECF No. 34-2.  In its response, Defendant confirmed that, at the time of its response, it did not intend to call any expert witnesses.  *Id.* at 3.  In fact, the only documents it produced in response to the Requests were written statements from Ms. Pinkney and one other Hair Cuttery employee and a list of transactions Defendant performed on Ms. Ferguson's hair.  *Id.* at 5, 7.  Among other things, Defendant conceded that they had no "policies, training materials, manuals or other instruction or guidance" for employees such as Ms. Pinkney "regarding the performance of chemical treatment services to customers."  *Id.* at 6. To the extent that Plaintiff may have had concerns with the completeness of Defendant's responses, she did not seek relief from the Court other than an extension of the relevant discovery deadline.

On August 1, 2022, the parties informed the Court that they had completed discovery. ECF No. 31. On August 29, 2022, Defendant moved for summary judgment. ECF No. 32. The parties have since completed briefing the motion. ECF Nos. 33, 34.

## STANDARD OF REVIEW

The Court will only grant a motion for summary judgment if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If there are factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then the Court must deny the request for summary judgment. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950). The moving party bears the burden of showing that there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Pulliam*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the non-moving party. *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 438 (4th Cir. 1998). "A party who bears the burden of proof on a particular claim must factually support each element of his or her claim." *Scott v. U.S.*, No. PJM–06–2777, 2007 WL 3020185, at *1 (D. Md. Feb. 23, 2007). "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden

8

of proof, it is their responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson*, 477 U.S. at 256.

In *Celotex*, the Supreme Court stated:

> where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

477 U.S. at 324.

## ANALYSIS

The question posed by Defendant's Motion and Plaintiff's Response is a relatively straightforward one: whether a plaintiff alleging negligent application of a chemical to a plaintiff's hair must definitively establish the relevant standard of care and causation with expert testimony. ECF No. 32-1, at 1, or may the plaintiff rely on *res ipsa loquitur* to survive summary judgment. ECF No. 33-1, at 4. Defendant's argument in response is clear – without expert testimony establishing the standard of care and causation, a plaintiff cannot go to trial. *See* ECF No. 34, at 4 ("This is not a case where plaintiffs can be permitted to rely on *res ipsa* because lay jurors do not possess the background knowledge necessary to decide whether these events ordinarily occur in the absence of someone's negligence."); *id.* at 5 ("This reliance on this evidence in such way is improper as the type of injury caused here must be proved by a designated expert in the field[.]"). As discussed below, courts have rejected the argument that *res ipsa loquitur* is inapplicable in

cases alleging chemical damage to hair and that such claims must instead be supported by expert testimony.

### I. When Maryland Requires Expert Testimony to Establish Negligence.

To prevail in a negligence action, the plaintiff must prove: "1) that the defendant was under a duty to protect the plaintiff from injury, 2) that the defendant breached that duty, 3) that the plaintiff suffered actual injury or loss, and 4) that the loss or injury proximately resulted from the defendant's breach of that duty." *Rowhouses, Inc. v. Smith*, 446 Md. 611, 631, 133 A.3d 1054 (2016) (quoting *Hamilton v. Kirson*, 439 Md. 501, 523–24, 96 A.3d 714 (2014)).

In support of such a claim, "[e]xpert testimony is generally admissible when it would be useful to the factfinder in understanding evidence or determining a fact in issue." *Steamfitters Local Union No. 602 v. Erie Insurance Exchange*, 469 Md. 704, 737, 233 A.3d 59 (2020). However, "[e]xpert testimony is *required* 'only when the subject of the inference [to be drawn by the jury] is so particularly related to some science or profession that it is beyond the ken of the average layman[.]'" *Johnson v. State*, 457 Md. 513, 530, 179 A.3d 984 (quoting *Bean v. Dep't of Health & Mental Hygiene*, 406 Md. 419, 432, 959 A.2d 778 (2008) (citations omitted)). Applying this rule, Maryland courts have required expert testimony in medical malpractice cases, *Sard v. Hardy*, 281 Md. 432, 448 n.5, 379 A.2d 1014 (1977); legal malpractice cases, *Short v. Ramsey*, No. 002742, 2017 WL 1013211 (Md. App. Mar. 15, 2017); cases concerning the operation of a railroad, *Asmussen v. CSX Transportation, Inc.*, 247 Md.App. 529, 559-560, 237 A.3d 908 (2020); cases involving a bank's standard of care when adding a customer to an account, *Schultz v. Bank of Am.*, 413 Md. 15, 35, 990 A.2d 1078 (2010); and cases involving the failure of certain complex mechanical devices such as escalators, *Holzhauer v. Saks & Co.*, 346 Md. 328, 341, 697 A.2d 89

(1997), and elevators, *Jones v. Schindler Elevator Corp.*, No. C-16-4972, 2018 WL 3116391, at *4 (Md. App. Jun. 25, 2018).

Importantly, "[e]xpert testimony is *not* required for matters that would be within the common knowledge of an average person." *Steamfitters Local Union No. 602*, 469 Md. at 737. Maryland courts have applied or stated this rule could apply in a wide variety of circumstances. *See id.* at 737-38 (holding that the "foreseeable risk of fire created by habitually discarding cigarettes in a combustible substance is a matter of common knowledge, well known to ordinary people"); *Free State Bank & Trust Co. v. Ellis*, 45 Md.App. 159, 163, 411 A.2d 1090 (Md. App. 1980) ("No expert testimony is needed to demonstrate to the jury that by doing what it did in the instant case, the Bank stripped its customer of his security for a $200,000 loan to another party."); *Asmussen*, 247 Md. App. at 560 ("For example, a jury may be able to conclude without the aid of expert testimony that a railroad has been negligent in failing to lay ballast, creating the muddy trackside conditions that cause an employee to slip and fall."); *Jones v. State*, 425 Md. 1, 28, 38 A.3d 333 (2012) (holding that a petitioner who did not present expert testimony "did not fail to establish the relevant standard of care in presenting her case for the State's negligent training of its deputy sheriffs on Fourth Amendment doctrine.").

## II. Expert Testimony and *Res Ipsa Loquitur*.

A plaintiff in a negligence case may also support their claim by reference to *res ipsa loquitur*. The doctrine "afford[s] a plaintiff the opportunity to present a *prima facie* case when direct evidence of the cause of an accident is not available or is available solely to the defendant," *Holzhauer*, 346 Md. at 334. Under the doctrine, the factfinder can use circumstantial evidence to infer that the defendant's negligence was the cause. *District of Columbia v. Singleton*, 425 Md. 398, 407, 41 A.3d 717 (2012).

Applying *res ipsa loquitur*, the factfinder may draw an inference of negligence if the plaintiff establishes: "(1) the plaintiff suffered an injury that does not ordinarily occur absent negligence; (2) the injury was caused by an instrumentality exclusively in the defendant's control; and (3) the injury was not caused by any act or omission by the plaintiff." *Deciutiis v. Six Flags America, LP*, No. 305, 2017 WL 1376671, at *3 (Md. App. Apr. 17, 2017). The exclusive-control requirement "may be established by evidence sufficient to warrant an inference of its existence, and circumstantial evidence may suffice. The plaintiff is not required in his proof to exclude remotely possible causes and reduce the question of control to a scientific certainty." *Tucker v. University Specialty Hosp.*, 166 Md. App. 50, 67, 887 A.2d 74 (2005) (quoting *Leidenfrost v. Atlantic Masonry, Inc.*, 235 Md. 244, 250, 201 A.2d 336 (1964)).

However, in cases in which the plaintiff must rely on expert testimony, they "must necessarily be precluded from relying on *res ipsa loquitur*." *Deciutiis*, 2017 WL 1376671, at *4. *Res ipsa loquitur* only applies when "'the circumstances attendant upon an accident are themselves of such a character as to justify a jury in inferring negligence as the cause of that accident.'" *Holzhauer*, 346 Md. at 338 (quoting *Benedick v. Potts*, 88 Md. 52, 55, 40 A. 1067 (1898)). "This is the case when 'the common knowledge of jurors [is] sufficient to support an inference or finding of negligence on the part of' a defendant." *Id.* (quoting *Meda v. Brown*, 318 Md. 418, 428, 569 A.2d 202 (1990)). As commonly stated, "jurors may draw an inference of negligence when a barrel of flour falls out of a warehouse window or where stairs collapse below a person's feet because it is a matter of common knowledge that such events ordinarily do not occur in the absence of someone's negligence." *Deciutiis*, 2017 WL 1376671, at *3 (internal citations omitted). By contrast, "in many cases involving medical negligence, and in cases involving injuries caused by

complex machinery, the common knowledge of jurors is insufficient to support an inference that the plaintiff's injury resulted from the defendant's negligence." *Id*. at 4.

Even if a plaintiff establishes the elements of *res ipsa loquitur*, "the plaintiff retains his or her burden to prove the defendant's negligence." *Singleton*, 425 Md. at 407. "A defendant confronted properly with a *res ipsa* inference is oblig[ated] to go forward with his case, shouldering what has been described as the 'risk of non-persuasion.'" *Id.* at 408 (quoting *Hickory Transfer Co. v. Nezbed*, 202 Md. 253, 262, 96 A.2d 241 (1953)).

### III. Negligence, Expert Testimony and *Res Ipsa Loquitur* in the Context of Hair.

Courts across the country, including those in Maryland, have held that a plaintiff in a negligence case may proceed to trial even if they do not have expert testimony demonstrating the relevant standard of care and conclusively establishing that Defendant's negligence caused the alleged damage to the plaintiff's hair. *See Wrenn v. Vincent et Vincent of Langley, Inc.*, 235 Md. 466, 468-72, 201 A.2d 768 (1964) (reversing a grant of judgment notwithstanding verdict in favor of a defendant where the plaintiff's claim regarding the negligent bleaching and dying of her hair was supported only by the plaintiff's testimony regarding the events on the day in question and the operator's testimony regarding the normal course of care); *Croteau v. Town & Country Salon*, No. CPU4-16-000257, 2016 WL 8653472, at *3 (Del. Aug. 5, 2016) (stating in a case alleging negligent administration of a "perm": "the Court finds there is no need for expert testimony because it is absolutely clear to the Court that a lay witness can prove, or disprove, negligence of the defendant was clearly the cause of plaintiff's severely damaged hair."); *Duvivier v. Kay's Oasis Enterprises, Inc.*, No. 09–ADMS–40020, 2010 Mass. App. Div. 31, 2010 WL 1139331 at *1-3 (Mar. 9, 2010) (holding that expert testimony was not required to support a claim of negligence where plaintiff alleged that the misapplication of hair affixing glue by a salon harmed her scalp);

*Martin v. Lehmann*, 147 So.2d 243, 245 (Ct. App. La. 1962) (allowing plaintiff to recover in a claim alleging that negligent application of permanent wave scarred plaintiff's scalp, even though the "record d[id] not contain any medical testimony, bills of the doctors, etc.").

Some courts have allowed a plaintiff to proceed to trial where a plaintiff has presented pictures showing damage to the plaintiff's hair, testimony recounting the occurrence of such damage shortly after the alleged negligent act, and evidence that prior to the treatment, the plaintiff's hair was in good condition. *See Croteau*, 2016 WL 8653472, at *3. Other courts have allowed a plaintiff to proceed to trial where they, like the plaintiff here, also presents expert testimony that the actions taken by the defendant could have caused the alleged damage to the plaintiff's hair. *Stahlberg v. Moe*, 283 Minn. 78, 83, 166 N.W.2d 340 (1969) (reversing directed verdict for plaintiff but remanding for a new trial where "the cross-examination of the doctor brought out the fact that an allergic reaction on the part of plaintiff was a *possible* cause of her condition.") (emphasis added); *Grant v. Younker Bros.*, 244 Iowa 958, 965-66, 58 N.W.2d 834 (1953) (affirming judgment where one of the examining doctors testified that the chemical agent "might have been the active producing cause of the rash he observed on plaintiff. And [a second doctor initially] said plaintiff had contact dermatitis 'caused by some chemical or allergy—producing an allergy of some kind or irritation[,]'" before later reversing his position.). None of these cases have required that a plaintiff present expert testimony demonstrating the standard of care and conclusively establishing that defendant's negligence caused the alleged harm to proceed to trial.

Consistent with these decisions, courts have allowed a plaintiff whose hair was damaged at a treating salon to rely on *res ipsa loquitur*. *McDougle v. Woodward & Lothrop, Inc.*, 312 F.2d 21, 23 (4th Cir. 1963) (justifying application of the doctrine in a case involving negligent

application of a permanent wave where plaintiff's expert testimony highlighted multiple possible causes of hair damage: "There is no question but that the treatment was exclusively under the control of the defendant's operator, Miss Curtis, or that she used the defendant's proprietary solution."); *Martin*, 147 So.2d at 244 (applying *res ipsa loquitur* where plaintiff alleged "that as a result of a permanent wave given by defendant's operator, her hair was ruined and her scalp was burned, causing her to become bald"); *Tsamourtzis v. Bergdorf Goodman Co.*, 201 N.Y.S.2d 912, 914-15 (1960) (applying *res ipsa loquitur* in a case involving alleged negligence of salon defendants in administering a treatment for the removal of superfluous hair); *Lanza v. Metcalf*, 25 So.2d 453, 455 (Ct. App. La. 1946) (awarding damages to the plaintiff based, in part, on the application of *res ipsa loquitur* in a case involving hair burns from the negligent administration of a permanent wave: "It is unnecessary in order to fix liability against appellant, to determine specifically why the accident happened. Different theories may be advanced to account for it, none of which are conclusive."); *Morrison v. Steppe's Beauticians, Inc.*, 95 Ohio App. 1, 6, 115 N.E.2d 868 (1953) (stating in a case involving creation of a permanent wave through the use of equipment and chemicals: "By refusing to apply the doctrine of *res ipsa loquitur* the trial court deprived the jury of its right to determine that issue from the evidence. We are of the opinion, therefore, that prejudicial error was committed thereby depriving plaintiff of a fair trial."); *Givens v. Spalding Cloak Co.*, 228 Mo. App. 169, 63 S.W.2d 819 (1933) (applying *res ipsa loquitur* in a case involving the application of heat to the hair and scalp of the plaintiff); *see also Maddocks v. Bennett*, 456 P.2d 453, 458 (Ak. 1969) ("Appellee could have merely shown that she went to appellant's beauty salon, had her hair dyed, and suffered total loss of hair due to the dye. Then by showing that the dying process was in the control of appellants and that loss of hair doesn't ordinarily occur without negligence, a *res ipsa loquitur* case might have been established.").

Likewise, "[n]umerous cases have held that the doctrine is applicable to hair treatments and permanent wave operations, and it is applicable not only to the use of mechanical devices but also to the chemical solutions used in the process." *Horton v. Seligman & Latz, Inc.*, 260 So.2d 731, 734 (Ct. App. La. 1972); *see also Bush v. Bookter*, 47 So.2d 77, 79 (Ct. App. La. 1950) (affirming that *res ipsa loquitur* applied equally to cases involving machine as well as chemical treatment of hair and finding that lower court erred in not applying it in case alleging permanent rinse was negligently applied to hair); *Grant*, 244 Iowa at 965 (stating in a case alleging the negligent application of a liquid cold wave: "the rule that the doctrine of *res ipsa loquitur* is applicable to a patron's action against a beauty parlor to recover for damages sustained in the treatment, where the instrumentalities were under the control of the operator, and the injury was such as would not ordinarily occur, is supported by the authorities"). As discussed, in Maryland, a court can only apply the doctrine in cases in which expert testimony is not required as a matter of law.

The reason for the regular application of the doctrine in the context of hair is fairly straightforward.

> It is common knowledge that many [persons] have permanent wave treatments without damage to their scalps or hair; it is also commonly known that human hair and scalps are sensitive to caustic compounds and to heat. These two commonly known facts lead to a third: permanent wave treatments do not ordinarily cause scalp burns and hair loss of the severity shown here if carefully performed by a beautician. This fact, plus the defendant's exclusive control and superior knowledge, satisfies the 'doctrine of probabilities'[.]

*Epps v. Ragsdale*, 429 S.W.2d 798, 800-01 (Mo. Ct. App. 1968). Many individuals are familiar with the details of hair treatment – making this context markedly different than the contexts in which Maryland has found that expert testimony is required. Hair relaxers, while not necessarily simple to apply, are available for purchase without prescription for usage by any individual. Crystal Martin, *How to Care for Your Relaxed Hair at Home*, N.Y. TIMES, Apr. 11, 2020. Whether

in the salon or at home, their use is common. *Id.* As Ms. Ferguson testified, she has received treatments similar to the one she alleged was negligently performed in this case every six to eight weeks for over forty years. Ms. Ferguson's experience is not unique. As one court stated in distinguishing cases involving hair care from those which require expert testimony:

> Here the operator was not called upon to perform a surgical operation, where it is a proper defense to show that the methods ordinarily followed in a surgical operation were followed. In this case, the plaintiff was well and simply called upon the beauty expert to receive a shampoo and a permanent hair curl[.] In performing this work, all the instrumentalities used in connection therewith were under the control of the defendant's operator, and if the evidence tends to show that in the exercise of ordinary care the injuries complained of would not ordinarily follow, the doctrine of *res ipsa loquitur* would apply. . . .

*Wincek v. Schultz Beauty Salons, Inc.*, 16 Conn. Supp. 345, 347 (1949) (quoting *Pearson v. Butts*, 224 Iowa 376, 276 N.W. 65, 67 (1937)); *see Epps*, 429 S.W.2d at 801 (rejecting defendant's comparison of hair treatment to the medical context: "The court held that common knowledge did not extend to the intricate subjects of medical negligence in diagnosis, childbirth and anesthetics. That conclusion does not control the simpler facts in our case.").

In response, Defendant primarily relies on the District of Columbia Court of Appeals' decision in *Scott v. James*, 731 A.2d 399 (D.C. 1999). Like Plaintiff here, the plaintiff in *Scott* alleged that the negligent application of chemicals – namely, hair relaxer – damaged her hair. *Id.* at 400. Although the plaintiff in *Scott* also sought to invoke *res ipsa loquitur*, their case was significantly weaker than plaintiff's case here. Not only did the plaintiff in *Scott* not present expert testimony demonstrating the standard of care and establishing causation, she failed to present any witnesses other than herself. *Id.* at 402. Further, as the Court noted, the plaintiff in *Scott* did not visit a treating physician until more than two years after the incident. *Id.* at 401. Finally, although the plaintiff raised the issue of *res ipsa loquitur* after trial, she failed to raise the issue anytime

before. *Id.* at 402. Nonetheless, the Court of Appeals addressed the substance of the plaintiff's argument, finding that damage to hair from mechanical devices could be within the common knowledge of the public, but damage from chemicals could not. *Id.* at 405. As noted above, multiple courts have rejected this distinction. Further, in drawing this distinction, the Court relied primarily on a case involving negligence in the context of escalators. *See id.* at 404 (citing *Hailey v. Otis Elevator Comp.*, 636 A.2d 426, 428 (D.C. 1994)). As the dissent in *Scott* noted, "[w]here plaintiffs have sought to recover damages for injuries which they allegedly sustained as patrons of beauty salons, the doctrine of *res ipsa loquitur* has been held applicable in numerous cases[.]". *Scott*, 731 A.2d at 408 (quoting Timothy M. Hall, *Annotation, Res Ipsa Loquitur—Beauty Salon Patron*, 93 A.L.R.3d 897, 900 (1979)) (Schwelb, J., dissenting). The decision as well as the scope of the District of Columbia's requirement regarding the presentation of expert testimony have been recognized as at odds with what most other jurisdictions require. *See* Colin Miller, *No Expertise Required: How Washington, D.C. Has Erred in Expanding its Expert Testimony Requirement*, 39 RUTGERS L. REC. 55, 58-59 (2012) (citing *Scott* as an example of how "the D.C. Court of Appeals has regularly required expert testimony for decades, even in cases 'that might initially seem to fall within jurors' common knowledge.'").

Accordingly, Plaintiff here has presented sufficient evidence to invoke *res ipsa loquitur*. As discussed, Plaintiff has presented testimony that prior to her treatment, she had healthy, shoulder-length hair on which she had been receiving treatments similar to those she received from Defendant every six to eight weeks for over forty years. On the day of the alleged incident, Defendant undertook procedures to her hair, applying substances of which it had superior knowledge and were exclusively in its control, which, according to Plaintiff, had the effect of damaging her hair as soon as the same evening after the alleged negligence. Photographs, medical

bills, and medical records from Plaintiff's dermatologist confirm damage to her hair. Additionally, Plaintiff has presented an expert's statement that the damage could have been the result of the chemical damage alleged. Finally, Defendant has conceded they have no paper records of any training, policies, instructions or guidance provided to Ms. Pinkney regarding the chemical treatment of hair. Although Defendant disputes the condition of Plaintiff's hair prior to the day of the alleged incident, this is a disputed issue of fact not appropriate for resolution at this stage of the case. Defendant may ultimately prevail by presenting sufficient evidence to rebut the inference from the doctrine, but the lack of conclusive expert testimony is not a basis to grant Defendant summary judgment.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is, hereby, denied.

So ordered.

Date: January 24, 2023                               _____/s/_____
                                                     Ajmel A. Quereshi
                                                     U.S. Magistrate Judge